**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **CANDACE GORDON,** | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| vs. | * | Case No. **RWT 03-CV-2719** |
| | * | |
| **ALION SCIENCE & TECHNOLOGY,** | * | |
| | * | |
| Defendant | * | |

**MEMORANDUM OPINION**

Plaintiff, Candace Gordon ("Gordon"), brings this action against her employer, Alion

Science and Technology (formerly known as IIT Research Institute) ("Alion").  Count I of her

Complaint asserts a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a),

arising from alleged discrimination on the basis of race.  Gordon alleges that Alion's

discriminatory employment practices included "continuous and ongoing hostile, racially

discriminatory activity" which forced her to resign from her position.  Compl. ¶17.[1]  Count II

asserts a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3(a), arising

from Alion's alleged retaliation against Gordon after she engaged in protected activity.  Gordon

alleges that her placement on a performance improvement plan ("PIP") was an adverse

employment action undertaken in retaliation for filing a complaint against Alion.  Compl. ¶24.

After the conclusion of discovery, Alion filed a Motion for Summary Judgment, and the Court

---

[1] Although Gordon's Complaint clearly states that the allegedly discriminatory treatment was an effort to "force her to resign," the record indicates that she was terminated, not that she resigned.  See P's Exhibit A; Supplemental Exhibit (Paper No. 36).

held a hearing on November 22, 2004.  As explained below, the Court will, by a separate order,

grant the Defendant's Motion.

## BACKGROUND

Gordon was hired by Alion in March 1999 as a software engineer.  During her tenure

with Alion she worked at a facility in Annapolis, Maryland.  Gordon's immediate supervisor was

Fred Dilley, a Caucasian male, and her Division Manager was Stuart Kennison, also a Caucasian

male.

Alion had a system for evaluating the performance of its employees.  Employees were

evaluated on a fiscal year basis, beginning and ending in September.  Because Gordon began her

employment in March 1999, her first performance evaluation covered the six months from March

1999 to September 1999.  In this first evaluation period her performance was satisfactory, but

from that point forward her evaluations deteriorated.  These post-September 1999 evaluations are

discussed in detail because they are an integral part of Gordon's claims and Alion's rebuttal.

Both parties agree that subsequent to receiving these negative evaluations Gordon was placed on

a PIP.  The parties' positions diverge, however, because Gordon claims that Alion's decision to

place her on a PIP was racially motivated, or at least a means of retaliating against her for filing a

complaint with the Equal Employment Opportunity Commission "(EEOC"), while Alion

contends that Gordon was placed on the PIP because of her poor evaluations.

In all five areas (technical, communication, timeliness/cost control, customer orientation,

and interpersonal responsibilities) of Gordon's first evaluation period, from March 1999 to

September 1999, her performance was "fully satisfactory."  P's Ex. B.  This initial six month

evaluation period, however, was the only period during which Alion was fully satisfied with

Gordon's work.  From September 1999 onwards, her evaluations deteriorated.

For the evaluation period from October 1999 to September 2000, Gordon received evaluations of "fully satisfactory" in four categories, but in the technical category she received a rating of "needs improvement".  D's Ex. 8.  Nevertheless, for that period, her overall evaluation was "satisfactory."  For the next evaluation period, from October 2000 to September 2001, Gordon received evaluations of "fully satisfactory" in three categories, but received a rating of "needs improvement" in both the technical and timeliness/cost control categories.  D's Ex. 9. These negative evaluations in two out of three categories resulted in an overall evaluation of "needs improvement."  Gordon alleges that her negative assessment for 2000-01 was primarily due to her failure to take exams to become an Oracle Certified Developer and refusal to work a 45 hour work week.  See P's Opp. at 2-3.  Because Gordon believed that these factors should not affect her overall evaluation, she refused to sign the appraisal form used as part of the evaluation process.[2]  In her Opposition, Gordon takes the same position, continuing to assert that her supervisors' ratings for this period were erroneous.  Although Gordon clearly harbors strong beliefs concerning the unfairness of the 2000-01 evaluation, the 2000-01 Performance Appraisal itself does not support her interpretation.

The Performance Appraisal is comprised of numerous sections.  One section, titled

_____

[2] Because Gordon refused to sign and date the 2000-01 Performance Appraisal, the Court is not aware of the exact date that the evaluation was given to her.  The September 1999 evaluation was signed by Gordon's supervisors on October 10th and 19th, and by Gordon on November 18th.  The September 2000 evaluation was signed by her supervisors on November 2nd and 10th, and by Gordon on December 4th.  Using these prior evaluations as estimates, it is reasonable to presume that Gordon received, and subsequently refused to sign, the 2000-01 evaluation in the beginning of December 2001.  The exact number of instances that Gordon refused to sign the evaluation is not disclosed by the record.  However, it is clear that on March 11, 2002, Stuart Kennison attempted to pick up the signed evaluation form from Gordon and at that point she told him that she would not sign it.  See P's Ex. F (letter to Kathy Madaleno, Alion's Human Resources Director).

"goals," lists numerous objectives to be accomplished within certain time frames.  One of Gordon's assigned goals for the 2000-01 evaluation period was "[t]o pass a series of five exams and become an Oracle Certified Developer by the early 2001 year."  D's Ex. 9 at 2.  The Appraisal listed five other goals as well.  A separate part of the Appraisal, titled "Performance Rating" evaluated Gordon's abilities in five separate aspects of her job.  A cursory review of the evaluations leads the Court to conclude that Gordon's disagreement is not well-founded because the longer work week and the failure to take the exams were in the "goals" section of the 2000-01 evaluation, a distinct part of the evaluation.  As such, they should be considered to be separate from, and not a contributing factor to, the ratings given for the five categories.  Therefore, the Court, even resolving all inferences in her favor, cannot accept Gordon's contention that she received a "needs improvement" rating because she did not meet two of her goals, i.e. taking these exams and working a 45 hour week.  Nevertheless, it is clear that Gordon refused to sign her evaluation because she considered it to be inaccurate and unfair.

After Gordon refused Mr. Kennison's requests that she sign the 2000-01 Performance Appraisal, Mr. James Colombo ("Colombo"), the Operations Manager for E3 database and engineering, asked Gordon to come to his office to meet with him.  P's Ex. A at 2.  At this meeting, which took place on March 12, 2002, Colombo acted in a manner that Gordon described as "very aggressive, threatening and hostile[.]"  P's Opp. at 3.  In a letter sent to Ms. Kathy Madaleno, the Director of Human Resources, Gordon described the allegedly abusive behavior displayed by Colombo at this meeting.  See D's Ex. 13.  Specifically, Gordon alleged that Colombo "tried to intimidate [her] into signing the performance appraisal" by thrusting his finger at her and telling her, generally, what a poor worker she was.  Id.  Although Alion, for

purposes of its motion, does not deny Colombo's behavior, it calls the Court's attention to the fact that Gordon has not alleged that Colombo made any <u>racially</u> <u>derogatory</u> remarks during the meeting.  After the March 12 meeting with Colombo, Gordon filed her first EEOC complaint, dated April 22, 2002, identifying Colombo as the "management official" who "harassed" her. <u>See</u> D's Ex. 14.

The next significant employment decision was the determination that Gordon be placed on a PIP.  Mr. Kennison testified that, with the counsel of Doug Ackerson, he made the decision to place her on a PIP because the "monthly evaluation period [would] help her see more clearly where her weaknesses were."  P's Ex. M (Kennison Dep.) at 26.[3]  Gordon was placed on this program on July 10, 2002.  Besides the monthly evaluations, Gordon was required to attend monthly meetings to discuss her performance.  P's Ex. A at 3.

The first period of evaluation under the PIP was July 10, 2002 to August 28, 2002.  In this evaluation, Gordon's technical skills were designated as "needs improvement," although in the other four categories she was rated "fully satisfactory."  For the next period of evaluation, August 29, 2002 to September 30, 2002, Gordon's technical skills were again designated as "needs improvement" while she received a rating of "fully satisfactory" in the other four categories.  D's Ex. 19.  In the next evaluation period, October 1, 2002 to October 31, 2002, Gordon received "no evaluation" for the technical category because there was "no technical effort accomplished."  P's Ex. K.  She also received a rating of "needs improvement" for the communication category, and

---

[3] Nothing in the record suggests that Mr. Kennison and Mr. Ackerson had knowledge that Gordon filed an EEOC complaint on April 22, 2002.  In fact, the record suggests that Mr. Kennison was not aware of the EEOC complaint because he claimed that he was not aware of whether the meeting with Colombo, which formed the basis for the EEOC complaint, occurred before or after the decision was made to place Gordon on the PIP.  P's Ex. M (Kennison Dep.) at 27.

received a rating of "unsatisfactory" in timeliness/cost control and interpersonal relations

categories.  Id.  The only category which was "fully satisfactory" was customer orientation.  Id.

Gordon explains this poor evaluation by stating that she missed work due to illness from October

14 to October 31 and that when she returned, her supervisor was on vacation.  P's Opp. at 5.

Additionally, Gordon received her yearly evaluation for October 2001 to September 2002 in the

same manner as she had prior to being placed on the PIP.  For this period, Gordon received an

evaluation of "needs improvement" for the technical and interpersonal responsibilities categories,

and a "fully satisfactory" evaluation for the other three.  Overall, her supervisor gave her a rating

of "needs improvement" for this evaluation period, the same unsatisfactory performance rating

that Gordon had received in the prior year-long evaluation period.

Continuing into 2003, the monthly evaluations did not garner the result that Alion had

anticipated; Gordon's evaluations continued to fall below Alion's standards.  For the period from

November 1, 2002 to January 7, 2003 Gordon received an evaluation of "unsatisfactory" for the

technical and timeliness/cost control categories; a "needs improvement" rating for the

communication category; a "fully satisfactory" rating for interpersonal relations; and the

customer orientation category was deemed to be "not applicable."  D's Ex. 22.  She received this

evaluation on January 27, 2003 and on the same day discussed that evaluation in a meeting with

her supervisors, where they concluded that continued monitoring was required.  D's Ex. 23.  This

began the final chapter in Gordon's employment with Alion.

Soon after the January 27th meeting, Gordon's doctor provided her with a note requesting

that Gordon be placed on stress-related leave.  P's Ex. A at 3; D's Ex. 24.  Her medical leave

form indicates that her predicted return was February 20, 2003, but both parties agree that she did

not return to work until a few months after February 20th.  When she returned she continued to

be monitored under the same monthly evaluation program.  P's Ex. A at 3.  On April 23, 2003,

while she was on short-term disability, Gordon filed her second EEOC claim.  <u>Id</u>.  The EEOC

issued Gordon a right to sue letter in June 2003 and she filed her complaint in this Court on

September 24, 2003.  <u>Id</u>.  Gordon was terminated on September 30, 2003 and contacted the

EEOC about filing a retaliation claim.  She filed a retaliation claim with the EEOC and received

a right to sue letter for this claim on June 21, 2004.  <u>Id</u>.  This Court denied Gordon's Motion to

Amend her Complaint to add claims based on her termination.  <u>See</u> Memo. Op. of Aug. 5, 2004.

Thus, Gordon's employment discrimination claims are (1) a hostile work environment, (2)

disparate treatment, and (3) retaliation for Gordon's first claim filed with the EEOC (filed after

the incident with Columbo).  Gordon's retaliation claim, therefore, does not relate to her

termination, although the relevant facts pertinent to both are essentially the same.


## DISCUSSION

This case comes before the Court on Alion's Motion for Summary Judgment.  <u>See</u> Fed.

R. Civ. P. 56.  Pursuant to Federal Rule of Civil Procedure 56, "summary judgment is proper 'if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law.'"  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322

(1986).  "A material fact is one that 'might affect the outcome of the suit under the governing

law.'"  <u>Spriggs v. Diamond Auto Glass</u>, 242 F.3d 179, 183 (4th Cir. 2001) (quoting <u>Anderson v.

Liberty Lobby</u>, 477 U.S. 242, 248 (1986)).

To prove a claim of employment discrimination based on race under 42 U.S.C. §2000e-2 ("Title VII"), a plaintiff may present either direct evidence of discrimination or circumstantial evidence of discrimination through the well-known burden shifting analysis set forth in McDonnell Douglas, Corp. v. Green, 411 U.S. 792 (1973). Where, as here, a plaintiff offers no direct evidence of discrimination, a court must apply the three-part proof scheme outlined in McDonnell Douglas. Under McDonnell Douglas, a plaintiff must first establish a prima facie case. See id. at 802. Once a plaintiff's initial burden is satisfied, the burden shifts to the employer to present a legitimate nondiscriminatory reason for the adverse employment action alleged. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). If the employer meets its burden, the burden then returns to the plaintiff to "'prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination.'" Id. (citing McDonnell Douglas, 411 U.S. at 804). Although the Supreme Court has created this burden shifting framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. (citations omitted).

Gordon's Title VII claim alleges that she was treated differently than similarly situated Caucasian employees and alleges that her work was subjected to exacting scrutiny because of her race. Thus, her discrimination claim (Count I) is really both a disparate treatment claim and a hostile work environment claim. Alion's broad rebuttal is typical of Title VII cases. It simply argues that neither Colombo's actions towards Gordon, nor the unique and intense scrutiny placed on Gordon's work product, has any relation to her race. However, before delving into Alion's defense of its personnel actions, it is Gordon's obligation to make a prima facie showing

of discrimination as required by <u>McDonnell Douglas</u>.

In order to make out a prima facie case of disparate treatment arising from Alion's employment decisions, Gordon must show that (1) she is a member of a protected class; (2) she has performed her job in a satisfactory manner; (3) Alion subjected her to an adverse employment action; and (4) similarly situated employees outside her class received more favorable treatment.  <u>See</u> <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 505-07; <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. at 254 & n.6; <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>see</u> <u>also</u> <u>Cottman v. Rubin</u>, 2002 WL 849257 at *1 (4th Cir. 2002).  In order to make out a <u>prima facie</u> case for her hostile work environment claim, Gordon must demonstrate that the enumerated conduct was "(1) unwelcome; (2) based on race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." <u>Spriggs</u>, 242 F.3d 179, 183-84 (4th Cir. 2001) (citing <u>Causey v. Balog</u>, 162 F.3d 795, 801 (4th Cir. 1998)).

"In this circuit, to establish a prima facie [Title VII] retaliation case, [Gordon] must show that: (1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action."  <u>Von Gunten v. Maryland</u>, 243 F.3d 858, 863 (4th Cir. 2001) (citing <u>Beall v. Abbott Laboratories</u>, 130 F.3d 614, 619 (4th Cir. 1997)).

**<u>Disparate Treatment</u>**

There is no dispute that Gordon, an African-American female, meets the first <u>prima</u> <u>facie</u> element necessary to set forth a disparate treatment claim.  The other three elements, however, are hotly disputed.  Alion argues that, as evidenced by her performance evaluations, Gordon's job

performance was unsatisfactory, and thus she fails to meet the second element.  Alion also argues

that requiring Gordon to be evaluated more often does not constitute an adverse employment

action, so she has not met the third element.  Moreover, even if the PIP does constitute an

adverse employment action, similarly situated individuals were not treated more favorably, so

Gordon has not established the fourth element.

The facts presented in the exhibits indicate that at least one aspect of Gordon's work

performance was unsatisfactory from the 1999-2000 performance term until her termination on

September 30, 2003.  Beginning with the 1999-2000 term, and continuing through her

termination, Gordon's technical skills, one of the 5 categories that Alion considers in its

evaluations, were "in need of improvement."  Although her technical skills were not satisfactory

during the 1999-2000 evaluation period, the other four areas met Alion's standards.  Thus, her

overall evaluation for the 1999-2000 term was "satisfactory."  In the 2000-01 and 2001-02

performance evaluations, however, Gordon received a deficient rating in other categories as well.

This resulted in overall ratings of "needs improvement" for each evaluation period.  In addition,

Gordon's more frequent evaluations, part of her PIP, reflected persistent deficiencies in various

aspects of her work.

Gordon does not dispute that Fourth Circuit case law clearly holds that "[i]t is the

perception of the decision maker which is relevant, not the self-assessment of the plaintiff."

Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996).  Rather,

Gordon disputes the conclusion that a rating of "needs improvement" is tantamount to her job

performance being "unsatisfactory," as that term is used in the second prong of disparate

treatment analysis.  Gordon also argues that she only received the lowest rating on monthly

performance evaluations ("unacceptable" rather than "needs improvement"), after the filing of her EEOC complaint based on the meeting with Colombo.  Effectively admitting that an evaluation of "unacceptable" is analogous to unsatisfactory, Gordon argues that her job performance was unsatisfactory only after the filing of her EEOC complaint.  This, she asserts, infers that the unsatisfactory evaluation was issued in retaliation for engaging in protected activity.

Gordon is correct that the overall evaluations for the periods from March 1999 to September 1999 and October 1999 to September 2000 were "fully satisfactory."  P's Ex. B & C. But, her overall evaluation from October 2000 to September 2001 was "needs improvement." D's Ex. 9.  Contrary to Gordon's assertions, this latter evaluation constitutes evidence that "[p]laintiff was not in fact meeting legitimate job performance expectations[.]"  King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003).  Because the overall evaluation of "needs improvement" was issued prior to Gordon filing her complaint relating to the meeting with Colombo, her contention that her work was only deemed to be unsatisfactory in retaliation for engaging in protected activity must be rejected.  Indeed, the meeting with Colombo, which was the incident that led to the filing of her first EEOC complaint, took place only because Gordon refused to sign the negative performance appraisal.  In fact, Alion's requirement that Gordon sign the September 2001 evaluation, combined with her vehement refusal to do so, is further evidence that both parties considered the "needs improvement" evaluation to be tantamount to an "unsatisfactory job performance."  Nevertheless, Gordon disputes that she was placed on the PIP because of her job performance, contending instead that she was placed on the PIP in retaliation for filing the EEOC complaint on April 22, 2002.

The contention that Alion placed Gordon on a PIP in retaliation for filing her EEOC complaint, rather than because of her unsatisfactory job performance, is facially a retaliation claim, not a disparate treatment claim.  However, the retaliation allegation is relevant to Gordon's attempt to meet her prima facie disparate treatment claim because if she was placed on the PIP due to retaliation, then she was not placed on the PIP solely because of her unsatisfactory work performance.  As the preceding analysis explained, Gordon's work performance was not satisfactory beginning with the receipt of her first "needs improvement" evaluation, issued approximately September 30, 2001.  This poor evaluation could not possibly be the result of retaliation because Gordon had not yet engaged in any protected activity.  Nevertheless, even if the Court were to assume that she was placed on the PIP in retaliation for filing her EEOC complaint, rather than because of her unsatisfactory job performance, Gordon cannot meet the third element of her disparate treatment claim.

In order for Gordon's disparate treatment claim to survive, she must show that Alion took an adverse employment action against her.  Gordon asserts that the adverse employment action was placing her "on a work plan and ultimately terminat[ing] [her] from employment."  P's Opp. at 13.  First, it should be reiterated that this Court did not permit Gordon to amend her complaint to add claims based on her termination from employment.  See Memo. Op. Aug. 5, 2004.  Therefore, it is only the PIP that Gordon may rely upon as the adverse employment action.  Alion contends that this is not an adverse employment action because "[d]isparate treatment theory . . . has consistently focused on the question whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting and compensating."  Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981).  Because the

decision to place Gordon on a PIP is not an "ultimate employment decision," Alion argues that Gordon has not met her burden with regard to the third prong of the <u>prima</u> <u>facie</u> showing required to set forth a claim for disparate treatment.  A more recent Fourth Circuit decision, however, explained that <u>Page</u> should not be read in such a limiting manner.

Citing this Court's opinion in <u>Cottman</u>, Alion contends that Gordon cannot meet the third <u>prima</u> <u>facie</u> element because placing her on a PIP is not "an adverse action dealing with 'ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating.'"  <u>Cottman v. Rubin</u>, 2001 WL 257830 at *3 (quoting <u>Page</u>, 645 F.2d at 233).  This argument is untenable in light of a case decided after <u>Cottman</u> in which the Fourth Circuit clearly held that "'ultimate employment decision' is not the standard in this circuit."  <u>Von Gunten</u>, 243 F.3d at 865.  <u>Von Gunten</u> further explained that <u>Page</u>'s statement–that only hiring, granting leave, discharging, promoting, and compensating are sufficient to rise to the level of adverse employment actions–was "nothing more than recognition that adverse employment action <u>includes</u> 'ultimate employment decisions.'"  <u>Id</u>. at 866 (emphasis added).  <u>Page</u> does not restrict "adverse employment action to 'ultimate employment decisions.'"  <u>Id</u>.  <u>Von Gunten</u>'s holding belies Alion's reliance on this Court's unpublished <u>Cottman</u> opinion.  Alion's position ultimately prevails, however, because the Fourth Circuit's affirmation of <u>Cottman</u>, decided after <u>Von Gunten</u>, concluded that placing an employee on a PIP does not constitute an adverse employment action.

In <u>Cottman</u> this Court held that an employer's "decision to place [the plaintiff] on a PIP cannot even remotely be considered an <u>ultimate</u> <u>employment</u> <u>decision</u> and therefore is not actionable."  <u>Cottman</u>, 2001 WL 257830 at *3 (emphasis added).  <u>Von Gunten</u> later held that a

personnel action <u>can</u> <u>be</u> <u>actionable</u> even though it is not an "ultimate employment decision."

However, even after <u>Von Gunten</u>'s clarification, the Fourth Circuit affirmed <u>Cottman</u>, holding

that "Cottman's claims [that] the [defendant] discriminated against him by placing him on a PIP,

not nominating him for the special investigative assignment, and not recommending him for the

Commissioner's award fail because the actions do not amount to redressable adverse

employment actions[.]"  <u>Cottman v. Rubin</u>, 2002 WL 849257 at *2 (4th Cir. May 3, 2002).

Although unpublished decisions do not create binding precedent, <u>see</u> 4th Cir. Local Rule 36(c),

the Fourth Circuit's opinion offers some guidance as to the specific issue of PIPs post-<u>Von</u>

<u>Gunten</u>.  Following <u>Cottman</u>, Gordon cannot meet the third element of the <u>prima</u> <u>facie</u> case, and

Alion is therefore entitled to summary judgment on this claim.


**<u>Hostile Work Environment</u>**

"To survive summary judgment for [Alion] on [her] claims of a racially hostile work

environment, [Gordon] must demonstrate that a reasonable jury could find [the] harassment (1)

unwelcome; (2) based on race; [] (3) sufficiently severe or pervasive to alter the conditions of

employment and create an abusive atmosphere[,] [and (4)] 'that there is some basis for imposing

liability on [Alion].'"  <u>Spriggs</u>, 242 F.3d at 184 (citing <u>Causey v. Balog</u>, 162 F.3d 795, 801 (4th

Cir. 1998)).  Gordon claims that the following actions constituted a hostile work environment:

(1) she was called into a meeting with Colombo, an individual not within her chain of command,

who "berated and humiliated" her, thrust his finger at her, told her she was incompetent,

attempted to force her to sign an evaluation, and then refused to apologize after being ordered to

do so; (2) she was denied training and ignored by her supervisor, while the same supervisor gave

assistance to a Caucasian employee; and (3) she was singled out for being late on projects while her Caucasian counterparts, who were also late on turning in projects, were not subjected to the same treatment.  P's Opp. at 13-14.[4]

Much of Gordon's hostile work environment claim revolves around her encounter with Colombo.  Looking at the Spriggs factors, the Court concludes that this encounter cannot form the basis of a racially hostile work environment claim, because nothing in the record supports the position that Colombo's behavior was racially motivated.  See D's Ex. 6 at 30, 120 (Gordon Dep.) (admitting that Colombo did not make any racially derogatory remarks to Gordon and further admitting that the only basis for her conclusion that Colombo's actions were racially motivated is her own feeling).  As such, the second element of the Spriggs test has not been met. Because her meeting with Colombo cannot form the basis of this claim, Gordon's hostile work environment claim rests on her allegation that she was treated differently than similarly situated employees, an allegation which, if true, creates the inference that the "unwelcome" behavior was based on race.  While Alion vehemently denies the allegation that Gordon's supervisors gave assistance to similarly situated Caucasian employees while denying the same to her, this disputed fact is ultimately not material to the disposition of Gordon's hostile work environment claim. Rather, Gordon's claim hinges on whether the claimed actions can possibly be deemed to be severe and pervasive or to create an abusive work environment.  See Spriggs, 242 F.3d at 184.

---

[4] The Court notes that Gordon also alleges, as an incident that contributed to the hostile work environment, that "[t]wo months after Ms. Gordon filed a complaint against Colombo, Colombo worked with Ms. Gordon's supervisor and a human resources manager to terminated [sic] her employment."  P's Opp. at 14.  As the record clearly indicates, Gordon was terminated on September 30, 2003 and she filed her complaint against Mr. Colombo on April 22, 2002.  Thus, Gordon's additional allegation is clearly an incorrect reflection of the record.  If Gordon, by this statement, is suggesting that the company placed her on a PIP in the summer of 2002 with the intent to terminate her in September of 2003, the Court cannot conclude that such an inference can reasonably be made from this record.

After considering the plethora of federal case law interpreting <u>Spriggs</u>' third element it is clear that Gordon fails to meet this fairly exacting standard.  In <u>Honor v. Booz-Allen & Hamilton, Inc.</u>, 383 F.3d 180, 190-91 (4th Cir. 2004), the court affirmed the district court's grant of summary judgment for defendant on plaintiff's hostile work environment claim where the plaintiff argued, as in this case, that an individual employee of the defendant was racially biased (analogous to the allegation against Colombo) and the defendant's "general culture" was one that tolerates discrimination (similar to Gordon's claims regarding Alion's practice of refusing to give assistance to minorities).  <u>Honor</u> found for the defendant because there was no evidence that the plaintiff was subjected to "racially-offensive conduct." <u>Id</u>. at 190.  In a statement that is highly relevant to the facts of this case, the court explained that "[the plaintiff] makes much of the treatment of other Booz Allen employees, but we focus on [the plaintiff's] personal experience." <u>Id</u>. (citing <u>Lowery v. Circuit City Stores, Inc.</u>, 158 F.3d 742, 761 (4th Cir. 1998), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds</u>, 527 U.S. 1031 (1999)).  Following <u>Honor</u>, Gordon's allegations concerning the assistance given to other employees does not form a valid hostile work environment claim.  Moreover, her own conclusion that these unspecified instances of refusal to give assistance constitute a hostile work environment is not sufficient to state a claim.  <u>See</u> <u>Harris v. Evans</u>, 221 F. Supp. 2d 635, 636 (D. Md. 2002) (granting defendant's motion for summary judgment on a hostile work environment claim because plaintiff "simply alleged a series of separate incidents occurring over the years that she alleges gave rise to her own belief that her work environment was hostile and abusive.").  Gordon's failure to allege the elements of a racially hostile work environment claim is buttressed by considering the types of conduct that courts have found to be "severe and pervasive."

Severe and pervasive conduct is typically far more offensive than the conduct alleged by Gordon.  For example, in the context of a sexually hostile work environment, the Supreme Court "directed courts to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (internal quotations omitted).  The Court explained that "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"  Id. at 788 (citing Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998)).  The Court wanted to "ma[ke] it clear that conduct must be extreme to amount to a change in the terms and conditions of employment[.]"  Id.  Such extreme conduct was found to exist in Spriggs where an African-American plaintiff was subjected, on a daily basis, to racist comments made by his supervisor.  Spriggs, 242 F.3d at 184-86.  Other federal cases have found a hostile work environment to exist only when the conduct was similarly extreme, offensive, and repeated, see e.g., Daniels v. Essex Group, Inc., 937 F.2d 1264 (7th Cir. 1991);  Snell v. Suffolk County, 782 F.2d 1094 (2d Cir. 1986), but not when such conduct (such as the unfortunately common occurrence of racial epithets and slurs) is sporadic or isolated, see e.g., Sallis v. Univ. of Minnesota, 322 F. Supp. 2d 999 (D. Minn. 2004); Curtis v. Airborne Freight Corp., 87 F. Supp. 2d 234 (S.D.N.Y. 2000).  Because the conduct Gordon complains of is vastly different from the extreme and offensive behavior outlined in the above cases, it is clear that Alion is entitled to summary judgment on her hostile work environment claim.

17

**Retaliation**

To reiterate, "[i]n this circuit, to establish a prima facie [Title VII] retaliation case, a plaintiff must show that: (1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." Von Gunten v. Maryland, 243 F.3d at 863 (citing Beall v. Abbott Laboratories, 130 F.3d 614, 619 (4th Cir. 1997)).  Under Von Gunten, although Gordon did engage in a protected activity (filing of a complaint with the EEOC), she cannot meet the second element due to the same deficiency as her disparate treatment claim.  See supra, at 12-14. Therefore, although there may be a disputed fact concerning the third element,[5] the failure to meet the second element requires this Court to enter summary judgment in favor of Alion.

---

[5] Alion argues that Gordon cannot meet the third element because her only support is her "belief" that her poor evaluations were due to the filing of her complaint.  Having considered Alion's extensive documentation of Gordon's below-average work product, the Court agrees that Gordon's belief is not enough to rise to the level of a disputed material fact.  See e.g., Malghan v. Evans, 2004 WL 2980753 at *1 (4th Cir. December 22, 2004) (citing Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989); Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980)).

**CONCLUSION**

For the above-stated reasons, Alion is entitled to Summary Judgment on Counts 1 and 2 of Gordon's Complaint, and the Court will, by a separate order, grant its Motion.  In addition, Alion filed a Motion to Strike and, in the Alternative, to Reply to Notice of Supplemental Exhibit to Opposition to Motion for Summary Judgment in response to Gordon's Notice of a Late-Filed Affidavit by Diane Smith.  As the Late-Filed Affidavit did not alter the Court's disposition of the case, the Court will, by a separate order, deny the motion as moot.


June 23, 2005                                         /s/
     Date                              ROGER W. TITUS
                          UNITED STATES DISTRICT JUDGE